IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JABBAR SACHET AL-KHAFAGI,

        Plaintiff,

    v.

CARI CRITES, Oregon State Correctional
Institution (OSCI), Registered Nurse (RN);
LORETTA IRVING, OSCI Medical Services
Manager; WARREN ROBERTS, Oregon
Department of Corrections (ODOC) Medical
Director; JOE BUGHER, ODOC Health
Administrator,

        Defendants.

Case No.: 3:19-cv-00669-AN

OPINION AND ORDER

Plaintiff Jabbar Sachet Al-Khafagi filed this action against defendants Cari Crites ("Crites"), Loretta Irving ("Irving"), Warren Roberts ("Roberts"),[1] and Joe Bugher ("Bugher"), alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment under 42 U.S.C. § 1983.  On July 29, 2024, defendant filed this Motion for Summary Judgment, ECF [131], pursuant to Federal Rule of Civil Procedure 56(a).  The Court heard oral argument from the parties on October 3, 2024. For the reasons set forth below, defendants' motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  However, "the mere existence

---

[1] Dr. Christopher DiGiulio ("DiGiulio"), former Medical Director of the Oregon Department of Corrections ("ODOC"), was originally named as a defendant in this action.  Dr. DiGiulio is now deceased and has been substituted by Dr. Warren Roberts, present Medical Director of ODOC.

of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted).  The substantive law determines which facts are material.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  *Id.* at 325.  Instead, the moving party need only prove that there is an absence of evidence to support the non-moving party's case.  *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial.  *Celotex*, 477 U.S. at 324.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.

## BACKGROUND

Plaintiff is an adult in custody ("AIC") at Oregon State Correctional Institution ("OSCI"). From August 2014 to April 2018, plaintiff was incarcerated at Two Rivers Correctional Institution ("TRCI").  Pl. Resp. to Defs. Mot. for Summ. J. ("Pl. Resp."), ECF [139], at 1.  Plaintiff was transferred to OSCI in April 2018.  *Id.* at 1-2.

Defendant Crites is an Institution Registered Nurse at OSCI.  *Id.* at 14; Defs. Mot. for Summ. J. ("Defs. Mot."), ECF [131], at 2.  Defendant Irving is Medical Services Manager at OSCI.  Defs. Mot. 2; Pl. Resp. 14.  Defendant Roberts is the current Medical Director of ODOC and has substituted Dr. DiGiulio, former Medical Director of ODOC, as a defendant in this action.  Defs. Mot. 2 & n.1; Pl. Resp.

13-14; Pl. Sur-Resp. to Defs. Mot. for Summ. J. ("Pl. Sur-Resp."), ECF [171], at 5.  Defendant Bugher is

Assistant Director for Health Services at ODOC.  Defs. Mot. 2; Pl. Resp. 14.  All defendants are sued in

their individual and official capacities.  Defs. Mot. 2-3.

Plaintiff's primary language is Iraqi Arabic, and he speaks and understands limited English

but cannot read or write in English.  Pl. Resp. 2.  When plaintiff entered ODOC's custody, he had working

vision in his left eye.  *Id.*  In January 2015, plaintiff reported ongoing issues with his eyes and saw ODOC-

contracted physician Dr. Steven Evers.  *Id.*; Defs. Mot. 3.  Dr. Evers referred plaintiff to Dr. Charles Sung

for a suspected cataract in his left eye.  Pl. Resp. 2-3; Defs. Mot. 3.

In May 2016, Dr. Sung performed cataract surgery on plaintiff's left eye.  Pl. Resp. 3; Defs.

Mot. 3.  There was no interpreter present at the surgery.  Pl. Resp. 3.  Plaintiff alleges that Dr. Sung could

not have obtained informed consent but performed the surgery anyway and then issued discharge

instructions in English.  *Id.*  Plaintiff also alleges that defendants did not translate or otherwise provide the

discharge instructions in Iraqi Arabic.  *Id.*  At the time of the surgery, Dr. Sung had already been publicly

disciplined for inadequate patient care, which plaintiff alleges defendants knew or should have known.  *Id.*

Plaintiff alleges that defendants never informed plaintiff of Dr. Sung's public discipline or licensure issues.

*Id.* at 4.  Plaintiff alleges that despite the surgery not fixing plaintiff's vision problems and Dr. Sung's

licensure issues, defendants sent plaintiff back to Dr. Sung for more treatment and surgery.  *Id.*  At a follow-

up visit for which no interpreter was present, plaintiff alleges that he attempted to indicate through his

limited English skills that his vision had not noticeably improved despite the surgery.  *Id.*  Dr. Sung

responded it would take time for his eye to heal and prescribed eye drops.  *Id.*  In November 2016, the

Therapeutic Level of Care ("TLC") Committee, which included Dr. DiGiulio, approved for plaintiff an

appointment with Dr. Sung for a vitrectomy consultation.  *Id.*

In February 2017, the TLC Committee approved plaintiff's vitrectomy.  *Id.*  Plaintiff alleges

that in March 2017, plaintiff had a pre-operative visit with Dr. Sung, during which there was no interpreter

and at which plaintiff signed an informed consent document that was not translated to plaintiff before or

after his signature.  *Id.* at 5. In April 2017, Dr. Sung performed a vitrectomy surgery on plaintiff's left eye.

*Id.*; Defs. Mot. 3.  Dr. Sung communicated with plaintiff in English before, during, and after the surgery, and there was no interpreter present.  Pl. Resp. 5.  Plaintiff alleges that he did not understand the importance of not moving during the surgery and was not able to convey his pain in the position that he was placed in on the surgical table.  *Id.* at 19.  Plaintiff allegedly moved during the surgery, and Dr. Sung tore plaintiff's retina with his instrument, causing secondary bleeding.  *Id.* at 5; Defs. Mot. 3.  Dr. Sung then put in silicone oil in the eye.  Pl. Resp. 5; Decl. Robert Sullivan Supp. Defs. Mot. for Summ. J. ("Sullivan Decl."), ECF [132], Ex. 1, at 50.  After the surgery, plaintiff's son asked Dr. Sung why plaintiff was not put to sleep during the surgery and why an interpreter was not used.  Pl. Resp. 5; Defs. Mot. 3.  Dr. Sung explained that he had performed plaintiff's 2016 cataract surgery while plaintiff was awake without issue and that he felt plaintiff understood basic English well.  Pl. Resp. 5; Defs. Mot. 3.

After the surgery, plaintiff repeatedly expressed concern that his vision was not improving and that he was experiencing pain.  Pl. Resp. 6.  Throughout October and December 2017, plaintiff notified ODOC staff through AIC Communication Forms ("kytes") and Non-Emergency Health Care Requests written by other AICs that he could not see and that his eyes were sensitive and painful.  *Id.*  In the first half of 2018, plaintiff continued to request treatment through communications that other AICs wrote in English. *Id.*; Sullivan Decl. Ex. 1, at 51.

In April 2018, plaintiff was moved from TRCI to OSCI.  Pl. Resp. 6.  On April 10, 2018, defendant Crites input progress notes regarding plaintiff's request to see a provider for eye pain.  *Id.*  During that month, plaintiff saw ODOC provider Dr. Bristol for his eye issues.  *Id.*  Plaintiff believed that Dr. Bristol was going to go to the TLC Committee so that plaintiff could be seen at the Casey Eye Institute at Oregon Health and Science University ("OHSU").  *Id.*  In May 2018, plaintiff continued to request to see a specialist at OHSU or elsewhere and to report eye pain.  *Id.*  Despite his requests to see a specialist, in early June 2018, plaintiff saw an ODOC provider who referred him for a "routine" appointment for follow up. *Id.*  Throughout June 2018, through communications that other AICs wrote in English, plaintiff continued to request that he see an eye specialist, reported eye pain, and asked if an interpreter would be available at the appointment.  *Id.* at 6-7; Sullivan Decl. Ex. 1, at 51.

On June 29, 2018, plaintiff saw a physician who sent plaintiff to the emergency room for his eye pain and advised a consult "STAT." Pl. Resp. 7. The emergency room physician referred plaintiff to Dr. Silvio Gurdian. *Id.* On June 30, plaintiff saw Dr. Gurdian. *Id.*; Sullivan Decl. Ex. 1, at 51. Plaintiff alleges that during this appointment, plaintiff learned for the first time that he may have lost vision in his left eye. Pl. Resp. 7. Plaintiff filed a grievance on July 5, 2018, to "alert the Oregon Department of Corrections of the constitutional and statute violations that occurred in addressing [his] vision issues for [his] left and right eyes." *Id.* at 8 (internal citation and quotation marks omitted). In the grievance, plaintiff stated that Dr. Gurdian "said that the prison waited too long to send [him] to be seen for these issues" and that plaintiff wanted "proper / timely medical for [his] eyes and . . . [monetary] compensation for [his] pain/suffering, loss of [his] sight, etc. . ." *Id.* On July 15, 2018, defendant Crites responded to plaintiff's grievance, with defendant Irving's signature. *Id.*; Defs. Mot. 4. Plaintiff alleges that Crites falsely stated in the response: "on your entry physical exam in 2014 that you had no vision in your left eye with past history of trauma and condition that is likely responsible for your vision loss in your left eye." Pl. Resp. 8. Plaintiff responded to Crites's response on July 17, 2018, and Dr. DiGiulio responded to his appeal on September 4, 2018, claiming that there was no delay in treatment or diagnosis and plaintiff was provided community standard care. *Id.* Defendant Irving was cc'd on this communication. *Id.* Plaintiff filed an appeal on September 10, 2018, to which defendant Bugher responded on October 10, stating that "there was no delay in treatment or diagnosis" and plaintiff was "provided community standard care." *Id.* at 9.

On January 1, 2019, plaintiff again requested to see specialists at the Casey Eye Institute to identify the issues and alleviate the severe pain he was experiencing. *Id.* From January to April 2019, plaintiff continued to request medical care and complain of eye pain. *Id.*; Sullivan Decl. Ex. 1, at 51-52. On February 6, 2019, after receiving a grievance interpreted through the language line, defendant Irving stated in an email that plaintiff was a "very difficult individual to speak with" and that she would "send [plaintiff's letter] through the language line." Decl. Heather J. Van Meter Supp. Pl. Sur-Resp. ("Van Meter Decl."), ECF [172], Ex. 10. On February 12, 2019, defendant Irving sent an email noting that she had been attending plaintiff's medical appointments and that plaintiff "has always spoken to [ODOC medical staff]

in English.  The Arabic is new for him." Pl. Sur-Resp. 4, 7; Van Meter Decl. Ex. 3.  In March 2019, Dr. DiGiulio, through his executive assistant, requested updated information regarding plaintiff's vision-related issues and appointments to see eye specialists.  Pl. Sur-Resp. 5; Van Meter Decl. Ex. 6.  That email thread also indicated that in March 2019, the TLC Committee had approved plaintiff to see a retina specialist, though the appointment was still pending.  Van Meter Decl. Ex. 6.  Plaintiff did not receive approval to see specialists at the Casey Eye Institute until 2021, which was conditioned on plaintiff paying for the care himself.  Pl. Resp. 9.

On April 29 and July 25, 2019, plaintiff saw Dr. Andrew Westfall.  *Id.* at 9-10; Sullivan Decl. Ex. 1, at 52.  On October 2, 2019, Dr. Westfall performed surgery to remove the silicone oil in plaintiff's left eye that had been left since the April 2017 vitrectomy and had begun to emulsify.  Pl. Resp. 10; Sullivan Decl. Ex. 1, at 52, 57-58.  There was no translator or interpreter present at the appointments or surgery.  Pl. Resp. 10.  Defendants allege that plaintiff was informed of the increased risk of retinal detachment, phthisis, and loss of the eye.  Sullivan Decl. Ex. 1, at 54.  On October 14, 2019, a nurse asked defendant Irving whether plaintiff could be seen by a provider sooner than when he was scheduled, to which Irving responded, "I have readjusted [the provider's] schedule three times now to get inmates in asap. Nope."  Pl. Sur-Resp. 3; Van Meter Decl. Ex. 2.  On November 7, 2019, plaintiff saw Dr. Westfall and was showing signs of proliferative vitreoretinal retinopathy and tractional detachment of the inferior retina.  Pl. Resp. 10; Sullivan Decl. Ex. 1, at 52.  In December 2019, defendant Irving sent an email instructing OSCI medical staff, including defendant Crites, to use the language line with plaintiff during medical appointments if he was not understanding the conversation, noting that there was a risk of legal liability if staff did not comply.  Pl. Sur-Resp. 2; Van Meter Decl. Ex. 1.  On January 29, 2020, Dr. Westfall performed a vitrectomy surgery with replacement of the silicone oil.  Pl. Resp. 10; Sullivan Decl. Ex. 1, at 52.  There was no translator or interpreter present at the surgery.  Pl. Resp. 10.  In a March 2020 post-operative visit with Dr. Westfall, plaintiff's vision remained poor.  *Id.*; Sullivan Decl. Ex. 1, at 52.

From March 2020 to March 2021, plaintiff made multiple requests for eye exams due to pain in his left eye.  Sullivan Decl. Ex. 1, at 58.  On March 2, 2021, ODOC staff sent emails reflecting that

ODOC was responsible for scheduling plaintiff for his appointments and that Dr. Westfall's clinic wanted plaintiff in "ASAP" because plaintiff was "way overdue for a follow up visit." Pl. Sur-Resp. 4; Van Meter Decl. Ex. 5. In March 2021, plaintiff saw Dr. Westfall, and Dr. Westfall recommended a second opinion from the Casey Eye Institute. Pl. Resp. 10; Sullivan Decl. Ex. 1, at 52-53. On June 15, plaintiff saw an ODOC provider, Dr. Warner, who recommended: "Refer to OHSU Retinal Specialist ASAP[.] Requests interpreter for exam." Pl. Resp. 11 (alteration in original and internal quotation marks omitted); Decl. Sophia C. von Bergen Supp. Pl. Resp. ("von Bergen Decl."), ECF [140], Ex. 48. Defendant Roberts, who was Chief Medical Officer at the time, unilaterally approved Dr. Warner's referral that day, without the need for TLC Committee approval. Pl. Sur-Resp. 5; Van Meter Decl. Ex. 8. On the same day, plaintiff filed a grievance to see a provider at OHSU, again written in English by another AIC. Pl. Resp. 10; Sullivan Decl. Ex. 1, at 53.

On June 29, 2021, plaintiff saw Dr. Phoebe Lin at the Casey Eye Institute, who concluded that additional ocular surgery would not help his vision and that plaintiff should consider enucleation, or removal of the eye, if his pain persisted. Pl. Resp. 11; Sullivan Decl. Ex. 1, at 53. Plaintiff filed another grievance regarding his care in July 2021. Sullivan Decl. Ex. 1, at 53. On September 29, 2021, plaintiff saw Dr. Lin for a follow-up visit, and Dr. Lin again discussed enucleation. Pl. Resp. 11; Sullivan Decl. Ex. 1, at 53, 58. Plaintiff filed a grievance on that day directed at Health Services at OSCI and four more grievances in September, October, and November 2021 for deliberate indifference regarding his left eye. Sullivan Decl. Ex. 1, at 53. Plaintiff alleges that in October 2021, through communications that another AIC wrote in English, plaintiff sought narcotic pain medication for severe pain relating to his eye, which request was denied. Pl. Resp. 11. Plaintiff alleges that he continued to seek help thereafter for eye pain through communications that another AIC wrote in English. *Id.* During this time, defendant Crites was involved in administering or training plaintiff on how to administer prescription eye drops. Pl. Sur-Resp. 6; Van Meter Decl. Ex. 9. On December 16, 2021, defendant Bugher responded to plaintiff's grievance regarding timely care, stating that he found no evidence of indifference and that plaintiff had had four ocular appointments in the last year. Sullivan Decl. Ex. 1, at 53; von Bergen Decl. Ex. 64. Plaintiff filed another

grievance on December 29, 2021.  Sullivan Decl. Ex. 1, at 54.  Defendants allege that in reviewing responses

to the grievances in the record, "there was no merit to the claims of indifference by Health Services."  *Id.*

          In January and February 2022, plaintiff continued to request help with pain in his eyes

through communications that another AIC wrote in English.  Pl. Resp. 12.  On January 4, 2022, plaintiff

reported that he was experiencing "level 10 pain" and that he could not sleep.  *Id.*  The next day, plaintiff

wrote in a non-emergency health care request:

> "The last four days I have sent Kytes for my left eye.  On a scale of 1 to 10 for pain, it is a
> 10, I have not been able to sleep for 3 days.  I need to see an eye doctor or something for
> pain.  Please reply back, the correctional officers in unit 13, are aware of my problems, and
> I have called medical, with negative results.  please help stop the pain.  Thank you."

*Id.*  Plaintiff was evaluated on January 6, 2022, for his left eye pain and was referred to OHSU.  Sullivan

Decl. Ex. 1, at 54.  In March 2022, plaintiff saw Dr. Davin Ashraf at the Casey Eye Institute.  Pl. Resp. 12.

In May and June 2022, plaintiff continued to report eye pain and seek help through communications that

another AIC wrote in English.  *Id.*  On June 24, 2022, plaintiff saw Dr. Ashraf for a follow-up visit, in

which plaintiff reported that his eye had stopped hurting but had turned white.  *Id.* at 12-13.  Dr. Ashraf

diagnosed plaintiff with ptosis and dense corneal edema without epi breakdown of the left eye and wanted

to improve the appearance of the blind eye.  *Id.* at 13.  On July 7, 2022, plaintiff saw Dr. Ashraf and stated

that his blind left eye was no longer painful and that he wanted a medical contact lens instead of a scleral

shell.  *Id.*  The TLC Committee denied plaintiff's request for a medical contact lens.  *Id.*

          Plaintiff alleges that today, his "left eye is white, cloudy, and has no vision at all."  *Id.*

Plaintiff further alleges that "[a]lthough the eye is now painless, [he] suffered extreme pain while his left

eye slowly died without any medical care or pain relief from [defendants]."  *Id.*

## DISCUSSION

          "In order to survive a motion for summary judgment on a § 1983 claim, the plaintiff must

establish a genuine issue of material fact that the defendant (1) acted under the color of state law, and (2)

deprived him of a constitutional right."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009)

(citing *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008)).  Defendants admit that they acted

under the color of state law.  Plaintiff brings his claim under 42 U.S.C. § 1983 for violations of his Eighth Amendment right to be free from cruel and unusual punishment.  Defendants move for summary judgment on the ground that plaintiff does not present any evidence that defendants acted with deliberate indifference, arguing that plaintiff's Eighth Amendment claim necessarily fails.[2]

## A.       Cruel and Unusual Punishment, 42 U.S.C. § 1983

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  The government's "failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle*, 429 at 103-05).  To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show that a defendant acted with "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104.

### 1.       *Serious Medical Need*

A "serious medical need" exists "if failure to treat the injury or condition 'could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain.'" *Colwell*, 763 F.3d at 1066 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).  Indications that a plaintiff has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

There is a genuine dispute as to whether plaintiff had a serious medical need.  Plaintiff

---

[2] During oral argument, defendants represented that they no longer dispute that plaintiff had a serious medical need. The Court also notes that defendants did not raise the issue of qualified immunity in the motion for summary judgment and accordingly declines to consider the merits of such a defense. *See, e.g.*, *Mackinney v. Nielsen*, 69 F.3d 1002, 1008 n.3 (9th Cir. 1995) (declining to address qualified immunity where the defendants' brief did not assert the defense); *Boudjerada v. City of Eugene*, No. 6:20-cv-01265-MK, 2024 WL 1271040, at *2 (D. Or. Mar. 26, 2024) (declining to consider qualified immunity where the defendant's motion for summary judgment mentioned qualified immunity in passing but presented no specific arguments).

alleges that because of defendants' failure to adequately or timely treat his eye issues, he experienced severe pain in his left eye over several years as his eye slowly went blind and died.  Plaintiff's medical records support this allegation.  Plaintiff has been diagnosed with detached retina, uveitis, and blindness, all of which are serious medical needs.  *See Herrera-Cubias v. Fox*, No. 08-CV-0517-TUC-AWT, 2012 WL 12539503, at *4 (D. Ariz. Sept. 10, 2012) (detached retina); *Pena v. Sherman*, No. 1:18-cv-01527-NONE-GSA-PC, 2020 WL 1853012, at *5 (E.D. Cal. Apr. 13, 2020), *report and recommendation adopted*, 2020 WL 4200086 (E.D. Cal. July 22, 2020) (uveitis); *Colwell*, 763 F.3d at 1066 (blindness).  Accordingly, summary judgment on this issue is not appropriate.

        2.        *Deliberate Indifference*

A plaintiff demonstrates deliberate indifference by showing (1) "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and (2) "harm caused by the indifference." *Jett*, 439 F.3d at 1096.  Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05).  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [a court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).  "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)) (alteration in original).  However, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless delays in treatment are not enough to sustain an Eighth Amendment claim. *Estelle*, 429 U.S. at 105-07; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

A defendant is liable under 42 U.S.C. § 1983 "only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Fayle v. Stapley*,

607 F.2d 858, 862 (9th Cir. 1979)). "A person deprives another 'of a constitutional right, within the meaning

of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform

an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].'"

*Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (citation and emphasis omitted) (alteration in original).

A supervisor may be liable under § 1983 if (1) the supervisor had "personal involvement in the

constitutional deprivation," or (2) there is "a sufficient causal connection between the supervisor's wrongful

conduct and the constitutional violation."  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation

omitted).

Plaintiff argues that defendants exhibited deliberate indifference to his serious medical

needs, thereby causing severe pain and suffering and permanent physical damage, by failing to provide (1)

an interpreter or translator for medical encounters so that plaintiff could communicate about his needs and

treatment and ODOC could obtain informed consent; (2) adequate medical care; and (3) timely medical

care.

a.        Failure to Provide Interpreter or Translator

As the Ninth Circuit has recognized, "[a]n impenetrable language barrier between doctor

and patient can readily lead to misdiagnoses and therefore pain and suffering.  This type of language

problem . . . can contribute to unconstitutional deficiencies in medical care." *Anderson v. Cnty. of Kern*, 45

F.3d 1310, 1316 (9th Cir. 1995) (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)).

Plaintiff has presented sufficient evidence to establish a triable issue of material fact

regarding whether defendants Crites and Irving acted with deliberate indifference in failing to provide

interpretation or translation so that plaintiff could communicate about his medical needs.  However,

defendants have shown an absence of evidence supporting plaintiff's claim that defendants acted with

deliberate indifference in failing to inform Dr. Sung of plaintiff's language needs.

Viewing the evidence in the light most favorable to plaintiff, plaintiff speaks and

understands basic English but cannot read or write in English.  Plaintiff made requests for medical care by

writing kytes in his native Iraqi Arabic.  When ODOC staff responded that plaintiff needed to write in

11

English, plaintiff asked AICs who did not speak Arabic to write his kytes, non-emergency health care requests, and grievances to defendants and medical providers in English.  On multiple occasions, plaintiff requested for an interpreter to be present during his medical appointments or filed grievances regarding his language needs.  Plaintiff alleges that there was no interpreter at any of his medical appointments with ODOC providers, nor was there one at his appointments or surgeries with Drs. Sung and Westfall.  His post-vitrectomy discharge instructions were given in English and were not translated into Arabic.  Finally, plaintiff provides evidence that defendants Irving and Crites knew of his requests for interpretation or translation.  In February 2019, after receiving a grievance interpreted through the language line, Irving stated in an email that plaintiff was a "very difficult individual to speak with" and that she would "send [plaintiff's letter] through the language line."  Van Meter Decl. Ex. 10.  Several days later, Irving stated in another email that "[t]he Arabic was new for [plaintiff]" and that medical staff had been able to communicate with plaintiff in English.  *Id.* at Ex. 3.  In December 2019, Irving instructed medical staff, including defendant Crites, to make sure to use the language line with plaintiff because "[ODOC has] been sued over small things like this."  *Id.* at Ex. 1.

Based on these facts, plaintiff establishes a genuine dispute as to whether there was a communication barrier affecting his medical care.  *See Jensen v. Shinn*, 609 F. Supp. 3d 789, 859 (D. Ariz. June 30, 2022) (noting that it is inappropriate "to use other prisoners as interpreters because the prisoner patient 'may not be comfortable disclosing sensitive, potentially embarrassing medical information' to the prisoner acting as a translator.").  Plaintiff also establishes a genuine dispute as to whether defendants Crites and Irving knew of plaintiff's language needs but failed to address them, thereby creating a substantial risk of serious harm and ultimately resulting in the loss of all vision in plaintiff's left eye.  *See id.* at 863-64 (holding that "inability to communicate one's medical and mental condition creates a substantial risk of serious harm.").  However, plaintiff does not present any evidence as to defendants Roberts and Bugher on this issue.  Accordingly, summary judgment is appropriate on this issue with respect to defendants Roberts and Bugher, but not with respect to defendants Crites and Irving.

Plaintiff also argues that defendants acted with deliberate indifference in not informing

outside providers of plaintiff's language needs.  Plaintiff concedes that it is the duty of the treating physician to obtain informed consent but argues that defendants had a responsibility to inform outside providers like Dr. Sung that plaintiff needed interpretation services so that they could obtain informed consent.  Plaintiff argues that because there was no interpreter present at plaintiff's appointments and surgeries with Dr. Sung, plaintiff was not fully informed of the vitrectomy and the importance of not moving during the surgery and could not convey his pain in the position he was placed in on the surgical table.  However, it is not clear that defendants had a duty to inform Dr. Sung of plaintiff's need for interpretation regarding the vitrectomy. It appears that a treating provider's duty to obtain informed consent would include confirming that a patient sufficiently understands the language that the provider is using to explain the procedure—in this case, English.  Even assuming without deciding that defendants had a duty to inform Dr. Sung or other outside providers of plaintiff's interpretation needs, plaintiff does not allege facts or present evidence to show that defendants were deliberately indifferent in not doing so.  Accordingly, summary judgment is appropriate on this part of plaintiff's claim.

> b.       Inadequate and Delayed Medical Care

Plaintiff's claims that defendants were deliberately indifferent in failing to provide adequate medical care and in delaying medical care overlap significantly and are best addressed together. Plaintiff has established a triable issue of material fact regarding whether defendants Crites and Irving acted with deliberate indifference in failing to provide adequate or timely medical care.  However, defendants have shown an absence of evidence supporting plaintiff's claim that defendants Roberts and Bugher acted with deliberate indifference.

Where a plaintiff alleges that delay of medical treatment evinces deliberate indifference, the plaintiff must also show that the delay led to further injury.  *See Hallett v. Morgan*, 296 F.3d 732, 745-46 (9th Cir. 2002); *Shapley*, 766 F.2d at 407.  A plaintiff need not show that their harm was substantial; however, a substantial harm would provide additional support for the plaintiff's claim that a defendant was deliberately indifferent to his needs.  *McGuckin*, 974 F.2d at 1060.  If the harm is an "isolated exception" to a defendant's "overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate

indifference." *Id.* (citations omitted).

Viewing the facts in the light most favorable to plaintiff, plaintiff entered ODOC custody in 2014 with vision in his left eye but some problems. After the April 2017 vitrectomy surgery, which resulted in plaintiff's detached retina, plaintiff notified ODOC staff multiple times that he could not see and that his eyes were painful. Plaintiff did not receive meaningful follow-up treatment for over a year after the vitrectomy, despite repeated requests for medical care. Since April 2018, plaintiff had made multiple requests to see an eye specialist at the Casey Eye Institute or elsewhere. Plaintiff's pain became so severe that when he saw a physician on June 29, 2018, the physician advised a consult "STAT" and sent him to the emergency room. von Bergen Decl. Ex. 33. The next day, plaintiff saw Dr. Gurdian and learned that he may have lost vision in his left eye. In July 2018, plaintiff filed his first grievance regarding his left eye, to which Crites responded that plaintiff had not had vision in that eye since 2014.

From 2019 to 2021, plaintiff repeatedly requested medical care and complained of eye pain. Plaintiff saw Dr. Westfall in April and July 2019. In October 2019 and January 2020, Dr. Westfall performed surgeries to remove or replace the silicone oil in plaintiff's eye, but plaintiff's eye pain continued. From March 2020 to March 2021, plaintiff did not receive meaningful treatment for his eye pain. In March 2021, Dr. Westfall's clinic told ODOC staff that they wanted plaintiff in "ASAP" because he was "way overdue for a follow up visit." Van Meter Decl. Ex. 5. Later that month, plaintiff saw Dr. Westfall again, who recommended a second opinion from the Casey Eye Institute. In June 2021, plaintiff saw an ODOC provider, who recommended referring plaintiff to an OHSU retinal specialist "ASAP." That same day, Dr. Roberts unilaterally approved the referral to OHSU. On June 29, 2021, plaintiff saw Dr. Lin at the Casey Eye Institute, who concluded that additional surgery would not help and plaintiff should consider enucleation. On that day and throughout the latter half of 2021, plaintiff filed multiple grievances regarding his left eye, to which defendant Bugher ultimately responded that there had been no deliberate indifference in plaintiff's care. Plaintiff continued to seek help for eye pain. In January 2022, plaintiff saw an ODOC provider after reporting "level 10 pain" for four days, and that provider referred plaintiff to OHSU. In March 2022, plaintiff saw Dr. Ashraf at the Casey Eye Institute. In June 2022, plaintiff saw Dr. Ashraf

again and reported that his eye had stopped hurting but had turned white.

Based on these facts, a reasonable jury could find that while plaintiff did receive some medical care, that care was inadequate or delayed, especially considering that plaintiff required substantial and frequent follow-up care for his detached retina and repeatedly requested treatment for his eye pain over the span of approximately five years. A reasonable jury could find that plaintiff was only approved to see an OHSU eye specialist in June 2021 after his eye had already died. Moreover, plaintiff alleges that defendants' failure to provide him with adequate and timely treatment caused plaintiff to suffer unnecessary and severe eye pain as his eye slowly died and became blind. Thus, plaintiff has not merely alleged that defendants delayed unreasonably in providing him with appropriate treatment; he has also alleged that the delay was harmful. *See Hallett*, 296 F.3d at 745-46; *Romero v. Vargo*, No. 06:12-cv-01993-HU, 2014 WL 3746527, at *7 (D. Or. July 29, 2014). Such a substantial harm provides additional support to plaintiff's claim that defendants were deliberately indifferent to his serious medical needs. *See McGuckin*, 974 F.2d at 1060.

Additionally, plaintiff presents sufficient evidence to establish a triable issue of material fact regarding whether defendants Crites and Irving personally participated in the failure to provide adequate and timely medical care. However, defendants have shown an absence of evidence that defendants Roberts and Bugher had sufficient personal involvement.

To start, plaintiff alleges that Dr. DiGiulio personally participated in plaintiff's care because as Medical Director, Dr. DiGiulio oversaw all providers and physicians within ODOC, and as a member of the TLC Committee, Dr. DiGiulio made decisions regarding plaintiff's care at least since November 2016, when the committee approved plaintiff's vitrectomy consultation. Plaintiff also alleges that the TLC Committee did not approve plaintiff's requests to see a specialist at the Casey Eye Institute, which began in April or May 2018, until June 2021.

Plaintiff offers *Fisher v. Cain*, No. 2:21-cv-00132-JR, 2022 WL 2307874 (D. Or. May 16, 2022), *report and recommendation adopted*, 2022 WL 2304490 (D. Or. June 27, 2022), and *Romero*, 2014 WL 3746527, for the proposition that Dr. DiGiulio personally participated in the alleged inadequate and

delayed medical care because he was a member of the TLC Committee.  However, mere membership in the TLC Committee alone is insufficient to show personal involvement.  *See Price v. Shelton*, No. 3:18-cv-00540-BR, 2020 WL 3229284, at *6 (D. Or. June 15, 2020) (questioning whether "membership on the TLC [is] sufficient to confer liability").  In *Fisher* and *Romero*, the TLC Committee members decided to deny treatment and delayed review of another physician's recommendations for treatment.  *Fisher*, 2022 WL 2307874, at *8-10 (denying summary judgment as to TLC Committee member who personally treated the plaintiff as the plaintiff's assigned provider, failed to schedule follow-up care, and did not consult or refer the plaintiff to an orthopedic specialist or perform diagnostic imaging on the plaintiff's re-torn bicep); *Romero*, 2014 WL 3746527, at *6 (denying summary judgment as to TLC Committee members where they repeatedly delayed consideration of a provider's recommendation for surgery for eleven months).  Although Dr. DiGiulio had the authority to make decisions regarding plaintiff's care, plaintiff does not provide evidence that Dr. DiGiulio received plaintiff's requests to see an OHSU retina specialist, let alone that the TLC Committee reviewed and denied these requests.  *See Price*, 2020 WL 3229284, at *6 (granting summary judgment as to TLC Committee member because the "[p]laintiff [did] not point to any decisions by the TLC that constituted inadequate medical care.").  In fact, Dr. Roberts unilaterally approved plaintiff's referral to an OHSU specialist, without TLC Committee approval.  Even assuming that there is evidence to support this allegation, plaintiff does not show that Dr. DiGiulio acted with deliberate indifference in denying such a request.  At most, plaintiff alleges a non-actionable difference in opinion as to which retina specialist he should see (*i.e.*, one at the Casey Eye Institute versus elsewhere).

The only other personal involvement plaintiff alleges is that Dr. DiGiulio denied plaintiff's grievance appeal on September 4, 2018, and that Dr. DiGiulio's assistant asked for an update on plaintiff's care on March 27, 2019.  However, knowledge of alleged inadequate care after the fact cannot be casually linked to previously committed constitutional violations.  *See Starr*, 652 F.3d at 1207 ("[P]laintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.").

As for defendant Roberts, plaintiff argues that Dr. Roberts personally participated in the alleged inadequate or delayed medical care because he had the power to unilaterally decide that plaintiff

could see a medical provider and thus could have allowed plaintiff to receive care from outside providers sooner but failed to do so. However, the only evidence that plaintiff provides to support this allegation is an email in which Dr. Roberts approved the OHSU referral for plaintiff's left eye in June 2021 without needing TLC Committee approval. Van Meter Decl. Ex. 8. This email alone does not show that Dr. Roberts was deliberately indifferent in failing to provide or delaying care; in fact, it shows that Dr. Roberts approved plaintiff's referral soon after he received the recommendation. Accordingly, plaintiff does not allege sufficient facts to demonstrate that defendant Roberts was personally involved in the alleged inadequate care or that there was a causal connection between Robert's conduct and the alleged inadequate care.

As for defendant Bugher, plaintiff argues that Bugher personally participated in plaintiff's care because he oversees all health care-related policy and procedures, all physicians and Nurse Practitioners, the health and well-being of AICs, and medical scheduling as Assistant Director of Health Services of ODOC. However, the only evidence of Bugher's personal involvement is his denial of plaintiff's grievance appeals on October 10, 2018, December 16, 2021, and May 2, 2022, regarding plaintiff's care after decisions about that care had already been made. Again, knowledge after the fact cannot be causally linked to previously committed constitutional violations. *See Starr*, 652 F.3d at 1207. Without more, plaintiff does not show that defendant Bugher personally participated in plaintiff's care or that there was a causal connection between Bugher's conduct and the alleged inadequate or delayed medical care.

As for defendant Crites, plaintiff argues that Crites is responsible for the health and well-being of AICs and was part of plaintiff's care team as an Institution Registered Nurse. Plaintiff has demonstrated that Crites was personally involved in plaintiff's treatment and requests to see providers from April 2018 to at least June 2022, as indicated when Crites acknowledged plaintiff's requests to see providers for eye pain and requests for pain medication, scheduled plaintiff's sick call, and trained plaintiff on how to administer his prescription eye drops. Plaintiff also provides evidence that Crites knew of plaintiff's language issues but appeared to downplay the risks that they could pose to plaintiff's care. Plaintiff further shows that Crites responded to plaintiff's July 2018 grievance by allegedly falsely stating that plaintiff had not had vision in his left eye since he entered ODOC custody in 2014. Accordingly, plaintiff has established

17

a triable issue regarding whether Crites knew of but minimized or ignored the severity of plaintiff's eye conditions and thus acted with deliberate indifference to plaintiff's serious medical needs.

As for defendant Irving, plaintiff argues that Irving is in charge of overseeing all physicians and Nurse Practitioners within OSCI, answering AIC grievance appeals, and overseeing the health and well-being of AICs as Medical Services Manager. Plaintiff also demonstrates that Irving directly supervised defendant Crites, who participated in plaintiff's care; attended some of plaintiff's medical appointments; and instructed ODOC staff on how to address plaintiff's requests for interpretation. Plaintiff shows that Irving was aware of plaintiff's grievances regarding interpretation and the alleged inadequate care and appeared to minimize or ignore plaintiff's concerns. Plaintiff also presents evidence that in October 2019, when a nurse asked Irving if plaintiff could be seen by a provider sooner, Irving refused the request, seemingly not for a medical reason but only because she had already rearranged the provider's schedule. Accordingly, plaintiff has established a triable issue of fact regarding whether Irving knew of but minimized or ignored the severity of plaintiff's eye conditions and thus acted with deliberate indifference to plaintiff's serious medical needs.

For the foregoing reasons, summary judgment is appropriate on this issue with respect to defendants Roberts and Bugher, but not with respect to defendants Crites and Irving.

## B.     Punitive Damages

"Punitive damages serve to punish the defendant for wrongful conduct and to deter the defendant and others from repeating that wrong." *Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005). In a § 1983 action, punitive damages may be awarded for malicious, wanton, or oppressive conduct. *See id.* at 808-09. "Not every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages." *Thomas v. City of Portland*, No. 05-1059-ST, 2007 WL 2286254, at *18 (D. Or. Aug. 3, 2007). "A plaintiff must 'make a showing beyond the threshold level of intent required for compensatory liability.'" *Id.* (quoting *Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir. 1998), *cert. dismissed*, 526 U.S. 1142 (1999)). "This requires proof that the defendant 'almost certainly knew that what he was doing was wrongful and subject to punishment.'" *Id.* (quoting *Ngo*, 140 F.3d at 1304).

Although there is a triable issue as to whether defendants Crites and Irving acted with deliberate indifference to plaintiff's serious medical needs, plaintiff does not present evidence to demonstrate that they acted with the type of malicious, wanton, or oppressive intent that punitive damages are designed to deter. Accordingly, summary judgment is appropriate on the issue of punitive damages.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment, ECF [131], is GRANTED in part and DENIED in part. Plaintiff's claims against defendants Roberts and Bugher are dismissed. Plaintiff's claims against defendants Crites and Irving continue as described in this opinion.

IT IS SO ORDERED.

DATED this 17th day of October, 2024.

Adrienne Nelson
United States District Judge